[Opinion delivered March 10, 1886.]

---

[No. 2036.]

## William Lawrence *v.* The State.

1. THEFT— OWNERSHIP.— To constitute the crime of theft it is not essential that the thief knows who is the owner of the stolen property. On the contrary, it is sufficient if he knows that it is not his own, and he takes it to deprive the true owner of its value, whether or not he knows the true owner.

2. SAME— MARKS.— The right of the true owner of hogs, sheep and goats to his property is not affected by the statutory requirement (article 4558 of the Revised Statutes) that he shall mark his hogs, sheep and goats before or when they are six months old, and the fraudulent taking of such animals, unmarked, is as much theft as though they were marked when taken. The owner's recorded mark is not even required as the best evidence of ownership, as is the case with brands.

3. SAME— EVIDENCE — CHARGE OF THE COURT— CASE OVERRULED.— A rule of law can never be subverted by local custom, and, in so far as it holds otherwise, the case of *Dibbs* v. *The State*, 43 Texas, 650, is overruled. The trial court, in this case, properly rejected evidence to the effect that a general custom, in the county of the offense, gave to any one the right to kill all unmarked hogs, over twelve months old, found on the range. It was not error, therefore, to refuse a special instruction to the effect that if the hogs were unmarked and were over six months old, and the defendant killed them not knowing them to belong to H., the alleged owner, he would not be guilty of theft.

4. SAME.— See the opinion *in extenso* for a charge of the court upon the subject of taking property under a mistaken claim of right, and upon the doctrine of reasonable doubt, *held* sufficient in this case.

5. SAME — PRACTICE.— Though the trial court may qualify or modify a requested instruction, so as to make it present the law as the court conceives the law to be, the trial court is not bound to qualify or modify an illegal or erroneous charge, but may refuse it altogether.

6. SAME — VERDICT.— See the statement of the case for a verdict *held* to be suffi-
ciently specific and definite.
7. SAME — FACT CASE.— See the statement of the case for evidence *held* suffi-
cient to support a conviction for misdemeanor theft.

APPEAL from the District Court of Gonzales.    Tried below before
the Hon. George McCormick.

The indictment in this case charged the appellant with the theft
of two hogs, of the aggregate value of $40, the property of B. C.
Hutchins, in Gonzales county, Texas, on the 1st day of December,
1883.   His conviction, and the penalty assessed, are expressed in
the verdict, to which allusion is made in the opinion, as follows:

"We, the jury, find the defendant guilty of theft of property of
value of less than $20, and assess his punishment at six months' con-
finement in the county jail, and $400 fine."

B. C. Hutchins was the first witness for the State.   He testified
that he was the owner of the two hogs,— sows,— described in the
indictment, and for the theft of which the defendant was on trial.
The animals were taken from the possession of the witness without
his consent, in Gonzales county, Texas, during the month of ——,
1883.    One of them was a Berkshire and the other a crossed Berk-
shire and Poland-China sow.    One of them, when taken, was very
heavy with pigs.    The Berkshire sow was a black animal with a
white blaze in the face.    She had a very peculiar depression of the
bone just beneath one of her eyes.    The other was a black and
white spotted sow.    Witness was a new comer in the county, and,
when the hogs were taken, had been but three or four days on his
brother's farm, located in the forks of the Guadalupe and San Mar-
cos rivers.    Witness brought the sows with him from Hays county,
where he had recently resided, and turned them out of the pen at
his new home, on the evening before they were taken.    Neither of
the sows was marked, though one was two years and the other
eighteen months old.    On the day after he turned his sows out, the
witness, with Louis Waul, a colored man, went to the river bottom,
which was in the field, to look for them.    On his way to the bot-
tom witness met the defendant and Hugo Weideman, and asked
them if they had seen anything of his hogs.    Defendant said that
they had not.    Witness and Waul went on farther into the bottom,
and presently found a trail over which some heavy body or bodies
had been dragged.    That trail led to a point where something had
been recently butchered.    Hog-bristles and blood indicated the
slaughter of hogs.    From that point the trail was followed to the

house of one Davidson. Witness then pressed forward and over-took the defendant and Weideman. Witness told defendant that he, defendant, had stolen his, witness's, hogs. Defendant dismounted from his horse and remarked that people were always accusing him of stealing and that he was tired of it. The witness told him again that he had stolen his hogs. Defendant replied that he had not seen any hogs. Witness replied that he knew better, for he had just seen where the hogs were killed, and had trailed them. Defendant then said that he killed two hogs on that morning, but that they were not the witness's hogs. Witness went with defendant and Weideman from that point to the house of Frank Lawrence, the defendant's brother. When the house was reached defendant said to his brother: "Mr. Hutchins claims those two hogs." Frank Lawrence came towards witness and said: "All right; we will give him two more for them." Witness talked with the parties awhile and told Frank Lawrence that he wanted a piece of the meat. He then followed Frank into the smoke-house, and examined a head which was in there, and found on that head a depression similar to the one he knew to be on the head of his Berkshire sow. The two sows were fine animals. Witness did not know the market value of that kind of stock, at that time, but he thought those two sows were well worth $20 each, and he would not have sold them for that price. Lawrence lived on the farm adjoining that occupied by witness, and his farm included a considerable portion of the river bottom. The two farms were separated by a fence. The ears on the head found in the defendant's smoke-house had not been cut. The head had been cleaned and the hair removed. Weideman was present, but said nothing during the witness's conversation with the defendant. It was about sundown when witness reached Frank Lawrence's house. Frank was then engaged in making sausage meat. The sows were hand-raised by the witness, were very gentle, and would weigh respectively about two hundred and one hundred and fifty pounds.

Louis Waul testified, for the State, that he went with Mr. Hutchins to hunt the two missing sows. Witness and Hutchins met the defendant and Weideman, when Hutchins asked if they had seen his hogs. Defendant replied that he had not seen any hogs at all. Mr. Hutchins and witness went on a short distance, and found a place where some hogs had been recently killed. From that point they followed a trail up to Davidson's house. Witness went back home, and Mr. Hutchins went on towards Mr. Lawrence's house. Witness saw the sows in the pen before Hutchins turned them out.

The place where the hogs were butchered was found within thirty or forty steps of the point where Hutchins and witness met Weideman and defendant.    The State closed.

Frank Lawrence, the brother of the defendant, testified in his behalf that on the morning of the day the witness Hutchins came to his house claiming certain hogs the defendant and Weideman brought to witness's house two hogs which they had killed.    Both of those animals were spotted sows.    One of them was left at witness's house, and the other was taken to Davidson's house.    The animals were in poor order, and would not weigh exceeding eighty or a hundred pounds each.    Defendant and Weideman were then in the witness's employ, and killed the hogs for the witness.    The hogs killed by defendant and brought to the witness's house on that day were unmarked.    When Hutchins came to the house and claimed to own the hogs, witness told him that if the hogs were his, he, witness, would pay him for them.    Witness asked Hutchins to get down from his horse, go into the smoke-house and examine for himself. It was after sunset when Hutchins went into the smoke-house, and so dark in there that a hog's head could not be distinguished from anything else.    Hutchins examined no head in the smoke-house, and the only head in that house at that time came from the carcass of a spotted sow, and not a black one.    Of this fact the witness was absolutely positive.    Witness had defendant and Weideman employed to kill hogs and do general work about the farm.    He gave them instructions about killing hogs.    Witness at the time of this transaction did not know Hutchins nor his hogs.    The defense proposed to prove by this witness the local custom of finders to kill all unmarked hogs caught on the range, if over a year old, but the proof was excluded.

Hugo Weideman testified, for the defense, that he was with the defendant throughout the day on which Hutchins claimed the hogs. Witness and defendant shot and killed two wild, unmarked spotted sows on that day.    Those two hogs were killed at the place where Hutchins afterwards claimed that his hogs were killed.    One of those hogs was taken to Davidson's house, and the other to Frank Lawrence's.    The witness was indicted for the theft of the hogs described in the indictment in this case, but the prosecution against him was dismissed by the district attorney.

Thomas Seigler testified, for the defense, that he saw the two hogs in controversy.    They weighed from eighty to one hundred pounds each, and were worth not exceeding $3.50 each.    Both animals were poor.    The sow left at Davidson's house was a spotted

animal. The sow left at Frank Lawrence's was a black animal with white spots on the forehead, and one white spot on the side of her head. There were no white spots on her body. The defense closed.

B. C. Hutchins, recalled by the State in rebuttal, testified that Frank Lawrence did not invite him to dismount and examine the hogs. Witness got down of his own accord, and said that he wanted a piece of the meat, only as an excuse to get into the smoke-house for the purpose of examining the hog's head which he saw in there through the open door. Witness's hogs were very fat. They were turned out of the pen on one day and were killed on the next.

The motion for new trial raised the questions discussed in the opinion.

*W. S. Fly*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

White, Presiding Judge. One theory of the defense in this case was that appellant was the hired hand of his brother. His brother, who was a witness, testified to that fact. After he had so testified, defendant further proposed to prove by him that he had instructed his brother, the defendant, to kill all unmarked grown hogs; and further, to prove by the witness that it was a general custom of the country that any one had a right to kill all unmarked hogs over twelve months old running on the range; and the court refused to admit such evidence, and defendant saved a bill of exceptions to the ruling and claims the ruling as error. Not only so, but upon this point he claims that additional error was committed by the court in refusing a special requested instruction as follows: "That the statutes of this State require that all hogs, sheep and goats shall be marked with the ear-mark of the owner, on or before they are six months old, and if the jury find from the evidence that the hogs in controversy were over six months old, and were unmarked, and that defendant killed them not knowing them to be the property of Hutchins, then the defendant would not be guilty of theft, and the jury should acquit."

In order to constitute theft it is not essential that the thief should know who is the owner of the property he has stolen, and such a doctrine was not intended to be announced as a general rule under the facts upon which the case of *Boyd* v. *The State*, 18 Texas Ct. App., 339, was decided. On the contrary, theft, or "a fraudulent

taking of the property of another, embraces the idea that the taker knew that it was not his own, and also that it was done to deprive the true owner of it " (*Smith* v. *The State*, 42 Texas, 444), whether he knew who the true owner was, or not.

No error was committed in refusing to admit proof that it was a general custom of the country that any one had the right to kill all unmarked hogs over twelve months old, running on the range. It is true that the law requires that the owner shall place his ear-mark upon hogs, sheep and goats, on or before they are six months old (Rev. Stats., art. 4558), but a failure to do so does not affect, much less destroy, the owner's right to his property. His recorded *mark* is not even required as the best evidence of ownership, as is the case with brands. (Rev. Stats., art. 4561; *Dixon* v. *The State*, 19 Texas, 134; *Johnson* v. *The State*, 1 Texas Ct. App., 333; *Love* v. *The State*, 15 Texas Ct. App., 563; *Dreyer* v. *The State*, 11 Texas Ct. App., 632.) To fraudulently take such property when unmarked is as much theft as if it had been marked. This is the rule of the law, and ignorance of the law is no excuse. (Penal Code, art. 14.) " A rule of law can never be subverted by local custom. To sanction the doctrine that it could would be to unsettle the law, would open for discussion and neighborhood proof not the facts but the law, and allow such neighborhood the right to claim a distinct law of its own, thereby destroying the beauty of the law which consists in the uniformity of its action throughout the land." (*Lockhart* v. *Dewees*, 1 Texas, 535; *McKinney* v. *Fort*, 10 Texas, 220; White & Willson's Ct. App. Civil Cases, §§ 272, 353, 696.)

It would seem that the case of *Dibbs* v. *The State*, 43 Texas, 650, announces a different doctrine, and in so far as it does it is hereby overruled. It is folly to talk about an individual gifted with enough intelligence to render him responsible for his acts honestly believing that he has the right to claim and appropriate all the unmarked yearlings, sheep, hogs and goats in Texas that are a year old. Such a custom would be a monstrosity which the law would never tolerate. It was not error to refuse defendant's special requested instruction as above quoted.

One of the instructions given by the court to the jury was as follows: " The jury are further instructed that if they believe from the evidence that the defendant took the hogs charged in the indictment, yet that he so took them with an honest belief, although he may have been mistaken in such belief, that he had the right or the authority to so do, or if the evidence on this point is such as to raise in your minds a reasonable doubt as to whether the defendant did

believe he had the right to take such hogs, then in such case you will give him the benefit of such doubt and acquit him."

This instruction fully and sufficiently covered the important material issues in the case with reference to which the appellant is here complaining. If he wished more specific instructions upon these points he should have asked them, and presented them in such shape as that the court could give them. Whilst a court may qualify or modify an instruction which is asked, so as to make it present the law as the court conceives the law to be, yet the court is not bound to qualify or modify an illegal or erroneous instruction, but may refuse it outright.

We are of opinion that the verdict of the jury is sufficiently definite and specific under our present statute. (Penal Code, art. 748.) There is some conflict in the evidence, but if the testimony of the State's witnesses is believed the proof is amply sufficient to support the verdict and judgment, and the judgment is affirmed.

*Affirmed.*