# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00537-CR

**Ray Castro Zapata, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 119TH DISTRICT COURT OF TOM GREEN COUNTY
### NO. B-17-0082-SB, HONORABLE MARTIN "BROCK" JONES, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Ray Castro Zapata appeals his convictions on two counts of forgery of a financial instrument, one count of theft of property valued at more than $200,000, and one count of money laundering in the amount of $20,000 or more but less than $100,000. *See* Tex. Penal Code §§ 32.21(d), 31.03(e)(7), 34.02(e)(2).[1] Zapata's offenses involve property belonging to the estate of John Edward Sullivan and began with the forgery of Sullivan's will. A jury assessed Zapata's punishment at: (1) 180 days' confinement in state jail and a $10,000 fine for each count of forgery, with the confinement sentences running concurrently; (2) five years' imprisonment

---

[1] Zapata's convictions were based on offenses that occurred in 2014. In 2015, amendments to the theft statute substituted "$300,000" for "$200,000" in section 31.03(e)(7) of the Penal Code. *See* Act of May 23, 1991, 72d Leg., R.S., ch. 565, § 1, sec. 31.03(e)(6), 1991 Tex. Gen. Laws 2003, 2004, *amended by* Act of May 31, 2015, 84th Leg., R.S., ch. 1251, § 10, sec. 31.03(e)(7), 2015 Tex. Gen. Laws 4209, 4214. Also in 2015, amendments to the money-laundering statute substituted "$30,000" for "$20,000" and "$150,000" for "$100,000" in section 34.02(e)(2) of the Penal Code. *See* Act of May 22, 1993, 73d Leg., R.S., ch. 761, § 2, sec. 34.02(e)(2), 1993 Tex. Gen. Laws 2966, 2967, *amended by* 2015 Tex. Gen. Laws at 4219.

and a $10,000 fine for theft, with a recommendation that the prison sentence be suspended and probated for 10 years; and (3) two years' imprisonment and a $10,000 fine for money laundering, with a recommendation that the prison sentence be suspended and probated for two years. The district court rendered judgments on the jury's verdicts. The district court also ordered Zapata to pay $1.8 million in restitution to Sullivan's estate. In three issues, Zapata contends that: (1) the evidence is insufficient to support his convictions for forgery and theft; (2) the district court erred by admitting his grand-jury testimony into evidence; and (3) the district court's restitution order should be reversed because no evidence supported the initial valuation of the estate. We will affirm the district court's judgments of conviction and order of restitution.

## BACKGROUND[2]

The circumstances surrounding Sullivan's death and his purported will resulted in a multitude of criminal prosecutions and civil litigation.[3] We address the facts relevant to Zapata's appeal in some detail, given his challenges to the sufficiency of the evidence supporting his convictions.

**Zapata's assistance with Sullivan's bail bond and actions after Sullivan's death**

Twenty-one witnesses testified during Zapata's lengthy jury trial. The jury heard that Sullivan was seventy-seven years old and a resident of San Angelo when he was arrested in March 2014 for online solicitation of a minor and possession of child pornography. His bond was set at $1 million for each offense. Sullivan secured his bonds for these offenses with the

---

[2] The facts are summarized from the testimony and exhibits admitted at trial.

[3] *See, e.g., Chabot v. Estate of Sullivan*, No. 03-17-00865-CV, 2019 Tex. App. LEXIS 2145 (Tex. App.—Austin Mar. 20, 2019, no pet. h.); *Law Offices of John S. Young, P.C. v. Deadman*, No. 03-17-00148-CV, 2017 Tex. App. LEXIS 11230 (Tex. App.—Austin Dec. 5, 2017, no pet.) (mem. op. on reh'g); *Young v. State*, No. 03-18-00080-CR (pending).

assistance of two local bondsmen, Zapata and Armando Martinez.[4]  Sullivan paid Martinez 15%

of the $2 million total bonds ($300,000), and Zapata received $150,000 of that amount.[5]

Sullivan was released from jail on April 1, 2014.  Thereafter, Zapata introduced Sullivan to John

Stacy Young, who became Sullivan's criminal-defense attorney.

The bailmen considered Sullivan a flight risk.  Martinez testified that Sullivan had

a condominium in Spain and the money to do "whatever he wished."  Thus, while Sullivan was

released on bail, Zapata closely monitored Sullivan's whereabouts.  Zapata drove Sullivan to get

food, monitor Sullivan's real-estate holdings, and collect rent on Sullivan's properties.

Text messages between Zapata and Young showed that Zapata took Sullivan to a

meeting with Young on June 3, 2014, the day before Sullivan's body was discovered.  After the

meeting, Zapata was unsure whether Young would need to see Sullivan again:

Young:      7:22 a.m.   Ray/Need to see john at 930 instead of 915.  Can you advise please

Zapata:     7:24 a.m.   Yes Sir 9:30

Young:      7:47 a.m.   Ray-I'm sorry-945.

. . . .

Zapata:     3:12 p.m.   Are you going to want to see John again?

Zapata:     3:13 p.m.   So I can tell him and he won't call everyone…  Gracias.

Young:      3:17 p.m.   No.  We covered it this morning.  I'm finishing up with a child
                        porn case-call you later

---

[4]  Martinez testified that Zapata did not have the insurance or collateral for $2 million of bonds, so he needed Martinez's assistance to underwrite them.

[5]  Martinez testified that Zapata wanted to charge Sullivan 20% of the bond, but Martinez proposed 15% instead because Martinez thought that Zapata's suggestion of 20% was excessive.

Zapata did not testify at trial, but the jury heard evidence[6] that Martinez was with him when they discovered Sullivan's body on June 4, 2014. Martinez recounted the events of that day for the jury. Near noon, Zapata called Martinez from outside Sullivan's house, reporting that Sullivan did not answer when Zapata knocked on the door to Sullivan's home and called his name. Martinez told Zapata that Sullivan might have had someone take him to the senior citizens' center and to check the house again after lunch. A few hours later, Zapata called Martinez to report that Sullivan was still not answering his door. After stopping at the senior citizens' center and confirming that Sullivan had not been there that morning, Martinez drove to meet Zapata at Sullivan's house. Their knocks at the front door went unanswered, and they proceeded to the back of the house. Through a window, Martinez saw that all the box fans and lights were on inside the house. Zapata removed a window screen and a box fan from an open window, and Martinez climbed inside. Zapata used his phone to photograph Martinez entering the house, and then followed him in. They split up, searching the house.

Inside the bathroom, Martinez found Sullivan undressed and slumped from the toilet into the bathtub, dead. Martinez called to Zapata, who came to the bathroom and photographed Sullivan. Martinez stated that Zapata sent the photo to Sullivan's criminal-defense attorney, Young, and called to confirm that Young had received the photo. But Zapata told a grand jury that he did not send that photo to anyone. While Zapata was speaking with Young, Martinez told Zapata that they needed to get out of there and call the authorities, but Zapata told him to wait and give him some time. Shuffling through papers on Sullivan's desk, Zapata said

---

[6] The jury considered Zapata's recollection of events in three exhibits admitted into evidence: (1) an excerpt of his testimony during a civil proceeding in probate court on October 7, 2014; (2) the reporter's record of his testimony before a grand jury on November 12, 2014; and (3) the reporter's record of his testimony before another grand jury on March 10, 2015.

that he had to find a document with "John Sullivan's signature on it." Martinez testified that Zapata eventually let him call 911, and while he did so, Zapata went into the kitchen and retrieved a book. The book was a missal, a small religious book that looked like a bible. Zapata took the missal, which he told Martinez that Sullivan had given to him, and placed it in his truck before the police arrived.

The jury heard an excerpt of Zapata's testimony at an October 7, 2014 probate proceeding during which Zapata recalled Sullivan saying that he had "written something here" in the missal and "if there's something goes on [sic], it's right here." Zapata said that he took the missal to Sullivan's attorney with "no idea what was in there." Additionally, Zapata testified to a grand jury that when he dropped off the missal to Young at his office, Young's probate attorney Christianson O. Hartman was already there, although nobody knew that a will was coming.

**Emergency application for Sullivan's cremation and probate proceedings**

On June 5, 2014, the day after Sullivan's body was found, Hartman—an attorney in Sweetwater who had an office building near Young's—took the missal to the Tom Green County Clerk's office and filed it as Sullivan's holographic will. The alleged will was handwritten on a page at the back of the missal and dated June 2, 2014. The alleged will listed Zapata as a witness and named Young, whom Sullivan had known for two months before his death, as the sole beneficiary. The deputy clerk who handled the filing, Amanda Deanda, testified that Hartman was "very nervous filing this will." She also thought it was unusual that "the will was written on the 2nd of June and [Sullivan] died on the 4th of June, and they filed the will on the 5th of June."

On June 10, 2014, Hartman filed an emergency application with the probate court to cremate Sullivan's remains. Two days later, Sullivan was cremated. Several witnesses

5

testified at trial that cremation would have been contrary to Sullivan's particular religious beliefs. On the same day as Sullivan's cremation, and before the will was probated giving Young control of Sullivan's estate, Zapata sent a text to Young indicating that Sullivan's house had been cleared of all papers and that shredding was underway:

Zapata: 9:42 a.m. Buenos Dias. all is well here with Chris and I. Clearing House of all papers is complete. Sorting, Stacking and Shredding is in full swing in Sweetwater.... Do not worry, enjoy weekend and keep the prayers going…. Many Blessings, if you need me just text…. Thanks

Young: 11:40 a.m. You are a good man. I appreciate you more than words express JSY

Also before the will was probated, Sullivan's longtime attorney Joe Hernandez saw Young at a criminal-law conference in San Antonio. Hernandez testified that Young asked him if he had heard that Sullivan, an orphan, had died and left a holographic will witnessed by Young's "good friend," Zapata. Young also mentioned that he had an upcoming hearing before probate Judge Ben Nolen. Hernandez told Young that Sullivan had a half-sister named Louise who lived in Worcester, Massachusetts. Hernandez also said that he had contact information for her and other family members somewhere in his office. Young responded, "Brother, you didn't say that. I didn't hear that." As Young was backing away, Hernandez chastised him saying, "John. Come on, John." Young then said, "You know what Brother, I am going to have to buy some of your time." Hernandez understood Young's remark as a request for an attorney-client-privileged visit with him, so that he would be unable to repeat what Young had just told him.

Judge Ben Nolen testified that during the June 16, 2014 probate hearing in his court, he placed both Young and Zapata under oath as witnesses. According to Judge Nolen, Zapata testified as to all things contained in the probate application, including that the will was in

6

Sullivan's handwriting, that Zapata had witnessed Sullivan signing the will, and that the will was in the back of a bible that Sullivan owned since childhood. Judge Nolen signed an order on the same day as the hearing, admitting Sullivan's holographic will to probate as a muniment of title and giving all Sullivan's property to Young. Judge Nolen testified that he would not have admitted the will to probate if Zapata had testified—as he did later to a grand jury—that he did not witness Sullivan signing the will and that he was unfamiliar with Sullivan's handwriting.[7] Three days after Young received Sullivan's estate, Zapata requested the payoff amount for a real-estate loan from his lender, First Financial Bank.

**Zapata's financial transactions after probate of will and use of his friend's IOLTA**

The jury heard about a series of financial transactions that took place between Young, Hartman, and Zapata after the alleged will was probated and Young received Sullivan's estate. On August 4, 2014, Young wrote a check to Hartman for $167,500. Hartman promptly deposited Young's check. On August 9, 2014, Hartman wrote a check for $65,312.50 to Juan A. Marquez.

Juan A. Marquez testified that he is a Dallas attorney and Zapata's longtime friend. Marquez testified that he did not know "Christianson Hartman" or "Chris Hartman." Marquez said that Zapata called asking for help, stating that he had a check and that "the lawyer" advised him not to cash it in San Angelo. Marquez denied knowing that the check was made payable to him. Marquez offered use of his IOLTA (interest on lawyers' trust account) at Bank of America to Zapata. Marquez and Zapata met with a bank officer at a Bank of America location in Dallas and deposited into Marquez's IOLTA a $65,312.50 check, made payable to

---

[7] Zapata told a grand jury that the first time he saw the alleged will was the day he testified at this probate hearing.

Marquez for "Services & Expense Reimbursement," signed by Chris Hartman, and drawn from the Law Office of Christianson O. Hartman, P.C. While at the bank and with Marquez's permission, Zapata changed the address for the IOLTA account to his post-office box address in Christoval, Texas, ordered checks with that new address, and ordered a stamp of Marquez's signature.

Bank records admitted into evidence showed that between September 3, 2014, and January 13, 2015, Zapata and his wife, Julie Zapata, wrote eight checks totaling $60,079.12 from Marquez's IOLTA using Marquez's signature stamp. Seven checks were made payable to Zapata or Zapata Enterprises, and one check paid off a note that Zapata had with First Financial Bank.

According to Marquez, Zapata later said that "he was having some trouble" and thinking about giving back the money spent from Marquez's IOLTA. The evidence showed that Zapata withdrew $68,000 from his investment account with SWS Group/Southwest Securities on January 27, 2015, and deposited it into his First Financial Bank account. The next day, Zapata sent Marquez a check from Zapata's First Financial Bank account for $60,097.12—the same amount that Zapata and his wife had spent from the IOLTA. Marquez testified that Zapata sent him a prepaid envelope and asked him to get a cashier's check and send it to Hartman's law office. Marquez complied, sending a cashier's check for $65,312.50 to Hartman in early February 2015, which Hartman promptly deposited. The State contended that this transaction was an attempt to "reverse" the disbursement of $65,312.50 that Hartman had made to Marquez. Zapata testified to a grand jury that he had not received any money from Young or Hartman. He further denied that he had been given or promised anything of value in excess of $2,500 from any source since Sullivan's death.

8

Stephen Thompson, who investigates complex financial crimes as a research specialist with the White Collar Crime and Public Integrity Unit of the Texas Attorney General's Office, testified about some of the same financial transactions that Marquez had discussed before the jury, but in broader scope and greater detail. Thompson described a series of financial transactions that began shortly after Young received Sullivan's estate from the probate court on June 16, 2014. Specifically, on July 25, 2014, Young transferred more than $1 million from an E*Trade account—originally part of the assets belonging to Sullivan's estate—to a Sterne Agee investment account belonging to Young. On August 1, 2014, Young drafted a $235,000 check to himself from the Sterne Agee account and deposited it into his "Real Estate Account" at First Bank Texas in Abilene. On August 4, 2014, Young wrote a check from his First Bank Texas account payable to the Law Office of Christianson Hartman for $167,500. Thompson testified that Young's $167,500 check to Hartman would not have cleared without Young's $235,000 deposit. Evidence showed that as of July 31, 2014, before the $235,000 deposit, the balance in Young's First Bank Texas account was only $19,885.58.

Thompson further testified that on August 9, 2014, Hartman wrote a check payable to Juan A. Marquez for $65,312.50. On August 22, 2014, Hartman's check was deposited into Marquez's IOLTA at Bank of America. Between September 3, 2014, and January 13, 2015, Zapata and his wife Julie wrote eight checks from Marquez's IOLTA that were payable to Zapata, Zapata Enterprises, or First Financial Bank, totaling $60,079.12. On January 27, 2015, Zapata withdrew $68,000 from an investment account he and his wife had with SWS Group/Southwest Securities, and Zapata deposited that $68,000 check into his First Financial Bank account. The next day, Zapata wrote a check for $60,097.12 from his First Financial Bank account to Marquez's IOLTA, but this IOLTA was at Chase Bank, not Bank of America.

9

Marquez subsequently transferred $65,312.50 from his Chase Bank IOLTA to the Law Office of Christianson Hartman.

**Authenticity of Sullivan's will questioned**

Texas Ranger Nick Hanna testified that Sullivan's longtime attorney Joe Hernandez contacted him on June 18, 2014, expressing concern about Sullivan's will. Ranger Hanna testified that Sullivan was an educated man, but his purported holographic will contained several grammatical and spelling errors and at least one factual error. Ranger Hanna also testified about his investigation, including that on June 4, 2014, after Sullivan's body was found, eight phone calls took place between Young and Hartman, fifteen phone calls took place between Young and Zapata, and seven phone calls took place between Zapata and Hartman. The calls Zapata had with Young and Hartman that day were deleted from Zapata's phone. But Zapata's phone still had a picture, taken the day before Sullivan's body was found, of a delinquent-rent note handwritten by Sullivan and witnessed by Zapata.

Sullivan's half-sister, Louise Chabot of Worcester, Massachusetts, testified that she and Sullivan saw each other and communicated intermittently over the years, including a few visits to each other's homes and exchanges of letters and Christmas cards. She stated that the last contact she had with him was in 2000 when their mother died. She recalled that Sullivan "was from the old school" of his faith and "would never believe in cremation" for himself. Chabot further recalled that Sullivan typically wrote in cursive, very seldom in print, and often included something in Latin. She testified that the writing in the alleged will was "not at all" like Sullivan's handwriting because it was in print, every letter "I" was in lower case, and the signature—particularly the way the letter "S" looked like the letter "F"—was not the way that

10

Sullivan typically signed his name. Chabot also noted that the document did not contain any Latin phrase or religious reference, contrary to Sullivan's normal practice.

Sullivan's home-health nurse, Willie Ruiz, testified that he saw Sullivan's signature several times a week over the eighteen-month period that he was caring for Sullivan. Ruiz explained that Sullivan had to sign for every visit that Ruiz made to Sullivan's house and that the signature on the will did not look like Sullivan's because Sullivan's actual signature would have been much larger. Ruiz stated that the language used in the will was "too elementary" and "written at a lower level of intelligence," not the way that Sullivan would have written. Ruiz also stated that he was surprised to learn of Sullivan's cremation because Sullivan "was very much against it."

Scott Quinn, a former fundraising director at a school for priests called the Society of Saint Pius X, had a close relationship with Sullivan. Quinn confirmed that the Society had not received money, if there were any, from an account at San Angelo Federal Credit Union that Sullivan had designated as "payable on death" to the Society. Quinn also acknowledged that Sullivan made large Christmastime gifts to the Society—including a $100,000 check that he wanted to go to an orphanage in India—and that Sullivan intended to leave a substantial part of his estate to the Society. Quinn opined that the alleged will did not look like a document that Sullivan would write because it omitted any Latin phrase, it was not in Sullivan's "very neat and beautiful" handwriting, the size of writing was tiny, the words were indicative of an intellectual ability less than Sullivan's, and the signature looked nothing like Sullivan's.

Sarah Pryor, a forensic document examiner in the Questioned Document section of the Texas Department of Public Safety Crime Lab, testified about her examination of handwriting from Sullivan, Young, and Zapata. Pryor's work included comparing the

11

"questioned document," i.e., Sullivan's alleged will, with handwriting exemplars[8] and documents written in the normal course of business from Young and Zapata. She stated that forensic document examiners express their scientific conclusions on a seven-category scale, ranging from "Elimination"—meaning the person whose handwriting is being compared would not have written the questioned document—to "Identification"—meaning that the person wrote the questioned document. The category at the center of the scale, "Inconclusive," means that there is no basis for either an identification or elimination. The categories progressing from the center toward the elimination end of the scale are "Indications May Not Have Written"— meaning that there is evidence supporting that the person did not write the questioned document, and "Strong Probability Did Not Write"—meaning that it is a virtual certainty that the person did not write the questioned document. Similarly, the categories progressing from the center toward the identification end of the scale are "Indications May Have Written"—meaning that there is evidence supporting that the person did write the questioned document—and "Strong Probability Did Write"—meaning that it is a virtual certainty that the person wrote the questioned document. Pryor acknowledged that in the hundreds of document examinations she has conducted, her conclusions have not usually been on the extreme ends of the scale.

Pryor testified that her conclusions about the handwriting in the alleged will were broken into two portions: the "extended portion," or body, and the signatures (those of Sullivan as testator and Zapata as witness). In summary, Pryor's analysis concluded that there were indications Sullivan might not have written the signature or the extended portion of the alleged

_____

[8] Pryor explained that exemplars are samples created by dictating the questioned document to a person and having them handwrite the material verbatim from the questioned document. Here, Ranger Hanna administered the exemplars to Young and Zapata as part of the case investigation.

will. Further, after examining several distinctive characteristics of Zapata's handwriting that were also present in Sullivan's alleged will—including loops in the lower case letter "p," using the capital letter "R" between lower-case-lettered words; using a capital letter "D" at the end of lower-case-lettered words; linking the lower-case letters "iv" in a way that appeared to be a "w"; and crossing pairs of the lower case letter "t" with one crossbar—Pryor concluded that, "[t]here are indications that Ray Zapata may have written the extended portion" of the will, meaning "there is evidence to support that he may have been the writer."

Samuel Allen, a San Angelo attorney who handles some probate work, testified that he knew Zapata personally and that he spoke with Zapata on behalf of a client on June 11, 2014, less than one week after Sullivan's body was discovered. Allen asked Zapata whether he was present when Sullivan signed the will, whether Zapata had witnessed Sullivan's signature on the will, and whether Zapata signed the will as a witness. According to Allen, Zapata answered "yes" to those questions. Allen "sensed that [Zapata] was uncomfortable" after a few questions, and Zapata referred Allen to the attorney who filed the pleading in probate court, Hartman.

Tracy Manning, a real-estate investor who executed thirty or forty contracts with Sullivan beginning in 2009, testified that he recognized Sullivan's handwriting, signature, and his typical writing style from their past business dealings. Manning recalled that Sullivan wrote using proper grammar and spelling, and when Sullivan wrote in print rather than cursive, he used primarily upper-case letters. Manning testified that the handwriting in the alleged will and the signature on it did not appear to be Sullivan's.

13

Sullivan's former attorney Hernandez testified that his twin brother[9] brought Zapata into the bonding business and that the three men shared an office building. Over the years, Hernandez became familiar with Zapata's handwriting. Hernandez testified that the handwriting and signature on the will admitted into evidence did not appear to be Sullivan's; rather, the handwriting appeared to be Zapata's.

Martinez, the co-bondsman with Zapata who discovered Sullivan's body, testified that he had doubts about the alleged will and was surprised that it left everything to Young because Sullivan "didn't like attorneys. He hated them." Martinez further testified that he confronted Zapata about the alleged will, asking, "How did this happen? How could this be? You know that this can't be possible, knowing John [Sullivan]'s intentions. . . . Did you and John Young make a deal to split the estate or what?" Martinez also told Zapata directly, "This is a forgery. There has been a crime committed here." Martinez testified that Zapata did not look him in the eyes when he responded, "Let the authorities handle it."

**Jury's verdict and Zapata's sentencing**

Zapata moved for a directed verdict when the State rested and again at the close of evidence. The district court denied both motions. The jury convicted Zapata on all four counts as charged: Count One alleged that Zapata committed forgery by making, completing, or executing a will purporting to be that of John Sullivan, who did not authorize the writing; Count Two alleged that Zapata also committed forgery by encouraging, aiding, or attempting to aid another to pass or publish a forged will to Judge Nolen; Count Three alleged that Zapata committed theft by aiding Young in unlawfully appropriating money or real property in an amount of $200,000 or more from Sullivan's estate or heirs; and Count Four alleged that Zapata

---

[9] Hernandez's twin brother was deceased by the time of trial.

14

committed money laundering by receiving or possessing checks from Marquez's IOLTA account, with aggregate proceeds of $20,000 or more but less than $100,000, derived from the theft of Sullivan's estate or heirs.

The district court sentenced Zapata in accordance with the jury's verdict and ordered him to pay $1.8 million in restitution to Sullivan's estate through its temporary administrator, Michael Deadman. The restitution award was made joint and several with any restitution that might be ordered regarding these facts, if Zapata's co-defendant(s) were convicted.[10] Zapata filed a motion for new trial that was overruled by operation of law. This appeal followed.

## DISCUSSION

**First issue: Sufficiency of evidence supporting forgery and theft convictions**

In his first issue, Zapata contends that the evidence is insufficient to support his convictions for forgery and theft. He also contends that without proof of his involvement in the will's forgery: (1) both of his convictions for forgery fail; (2) there is no "unlawful appropriation" to support his conviction for theft; and (3) there are no "proceeds of criminal activity" to support his conviction for money laundering.[11]

Applying a legal-sufficiency standard, we consider the evidence in the light most favorable to the verdict and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). "Beyond a

---

[10] *See* n.3.

[11] Because Zapata did not brief any issue challenging the sufficiency of the evidence supporting his conviction for money laundering, we do not address it. *See* Tex. R. App. P. 38.1(i), 47.1.

reasonable doubt, however, does not require the State to disprove every conceivable alternative to a defendant's guilt." *Ramsey v. State*, 473 S.W.3d 805, 809, 811 (Tex. Crim. App. 2015). We defer to the jury's resolution of conflicts in the evidence, weighing of the testimony, and drawing of reasonable inferences from basic facts to ultimate facts. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We apply the same standard to direct and circumstantial evidence. *Id*.

Circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Nisbett*, 552 S.W.3d at 262. Each fact need not point directly and independently to the defendant's guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Id*.; *see Ramsey*, 473 S.W.3d at 809, 811 (concluding that defendant's forgery conviction was supported by combined and cumulative force of all evidence, including circumstantial evidence, viewed in light most favorable to jury's verdict); *De La Paz v. State*, 279 S.W.3d 336, 350 n.46 (Tex. Crim. App. 2009) ("While it is hypothetically possible that a case of forgery could be established by direct evidence, such as eyewitness testimony, most cases of forgery rest on circumstantial evidence." (quoting *Parks v. State*, 746 S.W.2d 738, 740 (Tex. Crim. App. 1987))); *see also Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014) (noting that conviction for money laundering may be based on circumstantial evidence); *Ghana v. State*, No. 03-04-00024-CR, 2004 Tex. App. LEXIS 6825, at *5 (Tex. App.—Austin July 29, 2004, no pet.) (mem. op., not designated for publication) (concluding that circumstantial evidence supported defendant's theft conviction). Further, the trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence. *Acosta*, 429 S.W.3d at 625.

16

### 1. Forgery

A person commits an offense if he forges a writing with intent to defraud or harm another. Tex. Penal Code § 32.21(b). "Forge," in relevant part, means "to alter, make, complete, execute, or authenticate any writing so that it purports to be the act of another who did not authorize that act." *Id*. § 32.21(a)(1)(A)(i). Forgery is a state jail felony if the writing is or purports to be a will. *Id*. § 32.21(d). Zapata contends that there is no direct evidence that the will was fake and that no one who looked at the will indicated the handwriting was his.

However, the jury had evidence providing context for Zapata's actions after Sullivan's death, in addition to evidence that Sullivan did not write the alleged will,[12] but rather that Zapata did, including:

- immediately after the discovery of Sullivan's body, Zapata delayed Martinez's call to 911 until after Zapata called Young;

- shortly after the discovery of Sullivan's body, Zapata had fifteen phone calls with Young and seven phone calls with Hartman, but those calls were deleted from Zapata's phone;

- Zapata testified to a grand jury that he had only one phone call with Young before calling the authorities and that Young did not call him back;

- during one such phone call with Young, Zapata shuffled through papers on Sullivan's desk and stated that he had to find a document with Sullivan's signature on it;

- Zapata removed a missal from Sullivan's house and placed it in his truck before police arrived;

- Zapata testified that he did not get the missal from the house until after the police were there;

- Zapata did not notify police that he took the missal from the house;

- Zapata kept the missal overnight before delivering it to Young;

---

[12] Zapata acknowledges that the jury heard "testimony speak[ing] to whether the will is fake."

17

- Before the alleged will was probated, Zapata confirmed to Young that "Clearing House of all papers is complete" and that "Shredding is in full swing in Sweetwater";

- Zapata had a picture on his phone, taken the day before Sullivan's body was found, of a delinquent-rent note that Zapata had witnessed and Sullivan had handwritten;

- Sullivan was an educated man, but the alleged will inside the missal contained several errors in grammar and spelling;

- Zapata testified to a grand jury that Sullivan did not sign the alleged will;

- Zapata had previously testified to Judge Nolen that Sullivan did sign the alleged will;

- Zapata testified to a grand jury that he would not be able to recognize Sullivan's handwriting;

- Zapata had previously testified to Judge Nolen that he did recognize Sullivan's handwriting;

- Zapata testified to a grand jury that he did not recall his testimony to Judge Nolen about seeing Sullivan writing in the back of the missal;

- Zapata also testified to a grand jury that "there could be somebody else that could have written it [the alleged will], but I don't think it would be John Young";

- distinctive characteristics of Zapata's handwriting were present in the alleged will, including: loops in the lower case letter "p," use of the capital letter "R" between lower-case-lettered words; use of a capital letter "D" at the end of lower-case-lettered words; linking the lower-case letters "iv" in a way that appeared to be a "w"; and crossing pairs of the lower case letter "t" with one crossbar;

- forensic analysis found indications that Zapata may have written the body of the alleged will;

- according to Chabot, Manning, Quinn, and Hernandez, the handwriting and signature on the alleged will did not appear to be Sullivan's;

- according to Ruiz, the signature on the alleged will did not look like Sullivan's;

- according to Hernandez, the handwriting and signature appeared to be Zapata's; and

- when Martinez told Zapata, "This is a forgery. There has been a crime committed here," Zapata did not deny the accusations but responded, "[L]et the authorities handle it."

Further, during their deliberations, the jury had all the exhibits admitted into evidence, including the alleged will and numerous handwriting samples from Sullivan and Zapata. We conclude that the combined and cumulative force of all the evidence at trial, viewed in the light most favorable to the jury's conviction, was sufficient to allow a rational jury to find each element of forgery beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Nisbett*, 552 S.W.3d at 262; *Ramsey*, 473 S.W.3d at 809, 811.

### 2. Theft

Conviction for the offense of theft requires proof of an unlawful appropriation of property with the intent to deprive the owner of the property. Tex. Penal Code § 31.03(a). An "appropriation of property is unlawful if it is without the owner's effective consent." *Id*. § 31.03(b)(1). Under the relevant statute, theft is a first-degree felony if the value of the property stolen is $200,000 or more. *Id*. § 31.03(e)(7).[13] A will proponent who knowingly submits a will for probate with the specific intention of stealing an estate from others with the legal right to inherit commits theft. *See McCay v. State*, 476 S.W.3d 640, 646-47 (Tex. App.—Dallas 2015, pet. ref'd).

Here, Zapata was charged with theft "from the Estate of John Sullivan or from any heirs of John Sullivan, the owner thereof." *See* Tex. Code Crim. Proc. art. 21.08 ("When the property belongs to the estate of a deceased person, the ownership may be alleged to be in the executor, administrator or heirs of such deceased person, or in any one of such heirs."); *Edwards v. State*, 286 S.W.2d 157, 159 (Tex. Crim. App. 1956) (op. on reh'g) (concluding "under the peculiar facts in this case, that ownership of the money at the time it was charged to have been stolen could be alleged in the estate of Mary E. Rose, deceased"). Zapata contends that "even if

---

[13] *See* n.1.

the will was a forgery and even if he had something to do with it," the evidence failed to establish that he knowingly took money from an "owner" as defined in the Penal Code. *See* Tex. Penal Code § 31.03(a). Because the Penal Code defines an "owner" as "a person" and defines a "person" as "an individual, corporation, or association," Zapata claims that neither statutory definition includes the State or an estate. *See id*. § 1.07(a)(35) (preface to definition of "owner"), (38) (defining "person"). Specifically, Zapata contends that his theft conviction depended on proof that he knew of an "owner" and that he intended to deprive such owner of property. In his view, without a "person"—not the State and not an estate—to whom ownership reverted on Sullivan's death, commission of theft from an "owner" was impossible.[14]

Zapata's contention overlooks the broad definition of "person" in the Penal Code with reference to other statutory subsections. "Person" includes an "association," which in turn includes a "government or governmental subdivision or agency," and "government" is defined as including "the state." *Id*. § 1.07(a)(6) (defining "association"), (24) (defining "government"), (38). Thus, even if Zapata thought that Sullivan's estate would escheat, commission of theft from the State as a "person" and "owner" under the Penal Code was possible.

Zapata's indictment charged him with theft from Sullivan's estate or heirs. *See* Tex. Code Crim. Proc. art. 21.08; Tex. Penal Code § 31.03(a). The Penal Code does not define "estate" or "heir." However, the plain meaning of "heir" is "someone who, under the laws of intestacy, is entitled to receive an intestate decedent's property." Black's Law Dictionary 839 (10th ed. 2014); *see Parker v. State*, 985 S.W.2d 460, 464 (Tex. Crim. App. 1999) (relying on legal dictionary for plain meaning of "pass" because it is not defined in Penal Code's general

---

[14] Zapata denied making any effort to find out whether Sullivan had living relatives, despite sharing an office building with Sullivan's longtime attorney, Hernandez (who knew Zapata since the 1960s and also knew that Sullivan had a half-sister).

20

definitions or within specific forgery statute); *see also* Tex. Est. Code § 22.015 (defining "heir" as "a person who is entitled under the statutes of descent and distribution to a part of the estate of a decedent who dies intestate"). Under Texas law, the estate of a person who dies intestate and without a surviving spouse or parents passes to the person's siblings and the siblings' descendants. Tex. Est. Code § 201.001(e). Here, during her testimony at trial, Chabot acknowledged that she is Sullivan's half-sister and heir to his estate. *See id*.

Further, the definition of "owner" in the Penal Code includes a person with "a greater right to possession of the property than the actor [defendant]." Tex. Penal Code § 1.07(a)(35)(A) (defining "owner"). The district court provided this definition in its instructions to the jury. A conviction for theft does not require proof that the defendant knew the identity of the owner. *Cf. id*. § 31.03(b)(1); *see Lawrence v. State*, 20 Tex. Ct. App. 536, 540-41 (1886) (noting that "to constitute theft it is not essential that the thief should know who is the owner of the property he has stolen" that theft "embraces the idea that the taker knew that it was not his own, and also that it was done to deprive the true owner of it"). Thus, under either scenario Zapata suggests, the State and any heir to Sullivan's estate would be an "owner" because both would have a greater right to possession of the property described in the indictment than Zapata did. *See* Tex. Penal Code § 1.05(a) (dispensing with strict-construction rule and stating that provisions of Penal Code "shall be construed according to the fair import of their terms, to promote justice and effect the objectives of the code").

As we have discussed, sufficient evidence supported Zapata's forgery convictions. Presentation of that forged will as authentic to Judge Nolen resulted in Young's receipt of Sullivan's estate without the effective consent of "the owner thereof," i.e., "the Estate of John Sullivan," "any heirs of John Sullivan," or Chabot, who testified that she is Sullivan's

21

half-sister. Considering the evidence admitted at trial in the light most favorable to the jury's verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Zapata committed the charged offense of theft. *See Jackson*, 443 U.S. at 319; *Nisbett*, 552 S.W.3d at 262; *Ghana*, 2004 Tex. App. LEXIS 6825, at *5. We overrule Zapata's first issue.

**Second issue: Admission of Zapata's grand-jury testimony during trial**

In his second issue, Zapata contends that the district court violated his constitutional right against self-incrimination by admitting into evidence a transcript of Zapata's testimony before a grand jury panel in 2014 without showing on-the-record admonishments under article 20.17(c) of the Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 20.17(c).[15] However, because Zapata's appellate complaint does not comport with his objections at trial, this issue is not properly preserved for our review. *See* Tex. R. App. P. 33.1(a); *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014) (requiring party's appellate complaint to comport with objection at trial to preserve error).

During trial, defense counsel objected to the admission of Zapata's testimony before the grand jury because Zapata was not provided the warnings in article 38.22 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 38.22. When the State offered the grand-jury testimony, counsel told the district court that he would make the same objections he had made immediately before to an excerpt of Zapata's testimony from an October 7, 2014 probate proceeding; namely, that Zapata's statement was made without proper warnings, without any warnings about magistration, and without showing that it was a true and accurate recording. *See id*. Neither magistration nor proper recording are addressed in article 20.17(c), but they are

---

[15] The record reflects that Zapata received admonishments under article 20.17(c) before he began testifying to the grand jury in 2015. *See* Tex. Code Crim. Proc. art. 20.17(c).

addressed in article 38.22. *Compare id*. art. 20.17(c), *with id*. art. 38.22 § 2(a), § 3(a)(1), (3). Defense counsel further objected that: there were inadequate warnings as to Zapata's right to counsel, Zapata was not properly admonished, there was no showing that Zapata's statement was recorded properly, Zapata had not voluntarily waived his rights, and specifically, "the predicates required under 38.2[2] of the Code of Criminal Procedure" were not met. *See id*. art. 38.22, § 2(a)(3)-(4), (b), § 3(a)(1)-(3). The district court was never given the opportunity to rule on an objection raising a self-incrimination issue under article 20.17(c). *See* Tex. R. App. P. 33.1(a). Moreover, because article 38.22 warnings apply only to statements made by an accused during custodial interrogations, and not grand-jury investigations, the district court would not have abused its discretion by admitting the 2014 transcript over counsel's article 38.22 objection. *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966); Tex. Code Crim. Proc. art. 38.22, §§ 2, 3; *Nix v. State*, No. 12-09-00126-CR, 2010 Tex. App. LEXIS 3717, at \*14 (Tex. App.—Tyler May 19, 2010, pet. ref'd) (mem. op., not designated for publication) (noting that individuals in custody have broader rights than grand-jury witnesses); *see also Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016) (concluding that complaints about trial court's admission of evidence are reviewed under abuse-of-discretion standard). We overrule Zapata's second issue.

**Third issue: Sufficiency of evidence supporting restitution order**

In his third and final issue, Zapata challenges the district court's restitution order because no evidence supported the initial estate valuation of $8,168,284 and because Sullivan's market assets may have fluctuated in value.[16]  *See* Tex. Code Crim. Proc. art. 42.037(b)(1)

---

[16]  The restitution order is based on the evidence indicating that $1.7 million was stolen from Sullivan's estate and an additional $150,000 of attorney's fees were incurred in finding the estate assets lost to forgery and theft and converting title of property back to the estate, putting the approximate total restitution at the $1.8 million amount that the district court ordered.

(providing that "[i]n addition to any fine authorized by law, the court that sentences a defendant convicted of an offense may order the defendant to make restitution to any victim of the offense"). We review challenges to restitution orders under an abuse-of-discretion standard. *Campbell v. State*, 5 S.W.3d 693, 696 (Tex. Crim. App. 1999) (noting that "[a]n abuse of discretion by the trial court in setting the amount of restitution will implicate due-process considerations"); *Tyler v. State*, 137 S.W.3d 261, 266 (Tex. App.—Houston [1st Dist.] 2004, no pet.) ("Challenges to restitution orders are reviewed under an abuse of discretion standard."); *Urias v. State*, 987 S.W.2d 613, 615 (Tex. App.—Austin 1999, no pet.) ("The restitution ordered by the trial court will not be overturned on appeal absent an abuse of discretion."). A trial court does not abuse its discretion unless its decision is outside the zone of reasonable disagreement and made without reference to any guiding rules and principles. *Gonzalez v. State*, 117 S.W.3d 831, 839 (Tex. Crim. App. 2003); *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990); *Tyler*, 137 S.W.3d at 266.

Court-ordered restitution is subject to three limitations: (1) it must be only for the offense for which the defendant is criminally responsible; (2) it must be only for the victim or victims of the offense for which the defendant is charged; and (3) the amount must be just and supported by a factual basis within the record. *Burt v. State*, 445 S.W.3d 752, 758 (Tex. Crim. App. 2014). Restitution includes the value of the property on the date of the damage, loss, or destruction, or on the date of sentencing, less the value of any part of the property that is returned on the date that the property is returned. *Miller v. State*, 343 S.W.3d 499, 502 (Tex. App.—Waco 2011, pet. ref'd); *see* Tex. Code Crim. Proc. art. 42.037(b)(1). When, as here, the victim of the offense is deceased, the trial court "shall order the defendant to make restitution to the victim's estate." Tex. Code Crim. Proc. art. 42.037(d); *Tyler*, 137 S.W.3d at 266.

Testimony from a witness with knowledge about the amount of damage, loss, or destruction sustained as a result of the defendant's offense is sufficient to support a restitution order. *See, e.g.*, *Burris v. State*, No. 01-14-00900-CR, 2015 Tex. App. LEXIS 5791, at *3 (Tex. App.—Houston [1st Dist.] June 9, 2015, no pet.) (mem. op., not designated for publication) (restitution order supported by testimony from accountant, property owner's son, about losses from arson); *Strange v. State*, Nos. 01-09-00926-CR, 01-09-00927-CR, 2011 Tex. App. LEXIS 3241, at *25 (Tex. App.—Houston [1st Dist.] Feb. 24, 2011, no pet.) (mem. op., not designated for publication) (restitution order supported by testimony from consultant and accountant who were hired by victim to perform audit and who determined that $470,000 was missing from victim's account); *Bailey v. State*, No. 05-09-00959-CR, 2011 Tex. App. LEXIS 2389, at *6 (Tex. App.—Dallas Apr. 1, 2011, pet. ref'd) (mem. op., not designated for publication) (restitution order supported by testimony from victim's mother, who provided estimate of expenses incurred after robbery); *Todd v. State*, 911 S.W.2d 807, 811 (Tex. App.—El Paso 1995, no pet.) (restitution order was supported by testimony from victim's mother).

Here, Michael Deadman, the temporary administrator of Sullivan's estate, told the jury about the amount of money that the estate lost as a result of Zapata's crimes. Deadman testified that it was necessary to determine the value of Sullivan's estate upon the date of death for reporting to the Internal Revenue Service in an estate-tax return ("706 filing"). Deadman testified that the total gross value of the estate, as reported to the IRS, was $8,168,284. During cross-examination, defense counsel asked Deadman one question about the total gross value of the estate reported to the IRS on the 706 filing, and Deadman explained that such total was the sum of values for Sullivan's real property, notes payable to the estate, and cash on hand. Defense counsel did not ask Deadman for any further detail supporting the gross value of the

25

estate. *See Green v. State*, 880 S.W.2d 797, 802 (Tex. App.—Houston [1st Dist.] 1994, no pet.) (concluding that witness' testimony was "some evidence" supporting restitution order and that defendant had opportunity to cross-examine witness about basis for testimony on amount of loss from theft but defendant did not ask such follow-up questions).

Further, the district court admitted without objection State's Exhibit 70, a spreadsheet that Deadman prepared with the assistance of the estate accountant, reflecting the initial estate valuation of $8,168,284, the estate's debts, and the "unlocated difference." If Zapata thought that the calculations in that exhibit—including the initial estate valuation—were not properly substantiated, he had the burden to object to its admission. *See Lopez v. State*, No. 05-16-00041-CR, 2016 Tex. App. LEXIS 10998, at *7 (Tex. App.—Dallas Oct. 6, 2016, no pet.) (mem. op., not designated for publication) (noting that exhibit supporting restitution order was admitted into evidence without objection from defendant).[17]

Zapata has not shown that "no evidence" supported the initial estate valuation of $8,168,284 or that the district court's restitution order was outside the zone of reasonable disagreement. *See Campbell*, 5 S.W.3d at 696; *Gonzalez*, 117 S.W.3d at 839; *Tyler*, 137 S.W.3d at 266. Accordingly, we overrule Zapata's third issue.

## CONCLUSION

We affirm the district court's judgments of conviction and its order of restitution.

---

[17] The district court also admitted into evidence, over defense counsel's objection, certified copies of eight publicly filed deeds showing real property that Zapata owned.

26

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Triana and Kelly

Affirmed

Filed:   June 19, 2019

Do Not Publish